THE HONORABLE STANLEY A. BASTIAN

MICHAEL E. McFARLAND, JR., #23000
Evans, Craven & Lackie, P.S.
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632
Attorneys for Defendants

IN UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| RANDEY THOMPSON,<br><br>               Plaintiff,<br><br>vs.<br><br>CENTRAL VALLEY SCHOOL DISTRICT NO. 365; BEN SMALL INDIVIDUALLY AS SUPERINTENDENT OF THE CENTRAL VALLEY SCHOOL DISTRICT, CENTRAL VALLEY SCHOOL DISTRICT NO. 365 BOARD OF EDUCATION AND IN THEIR INDIVIDUAL CAPACITY BOARD OF EDUCATION MEMBERS AND DIRECTORS DEBRA LONG, MYSTI RENEAU, KEITH CLARK, TOM DINGUS, AND CYNTHIA MCMULLEN,<br><br>               Defendants. | Cause No. 2:21-cv-00252-SAB<br><br>MEMORANDUM OF DEFENDANT CENTRAL VALLEY SCHOOL DISTRICT et. al. IN OPPOSITION TO PLAINTIFFS MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION |

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 1

# I. INTRODUCTION

On August 17, 2020, Plaintiff Randey Thompson, then an assistant principal in Central Valley School District ("CVSD"), posted on his Facebook page a post containing a derogatory term ("Demtard") that is both hurtful harmful to the special needs students and their families served by CVSD. The post was also riddled with profanity and racial overtones (i.e., referring to Michelle Obama as a "hateful racist bitch" and the "little bitch of Marxist BLM, Antifa, and Soroas [sic] socialist"). Upon learning of the post, CVSD placed Mr. Thompson on paid leave while it investigated the matter. During that investigation, CVSD learned that Mr. Thompson had a history of using the same type of derogatory and harmful language at work. In addition, during the investigation, Mr. Thompson was both uncooperative and dishonest, falsely claiming that his Facebook account had been "hacked" by a Facebook employee.

After completing its investigation, CVSD determined that Mr. Thompson's conduct necessitated a transfer from his assistant principal position to a teaching position. This transfer was not based upon Mr. Thompson's political views, or any speech otherwise protected by the First Amendment. Rather, CVSD transferred Mr. Thompson based upon its conclusion that his use

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 2

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

of offensive and derogatory terms, both on Facebook and at work, were harmful to the special needs students and their families served by CVSD. He was transferred because the racial overtones used in his post and at work were harmful to the racially diverse population of students and families served by CVSD. He was transferred because his use of those demeaning, insulting and racially insensitive terms posed the real risk of causing significant disruption in Mr. Thompson's relationships with peers, subordinates, students and parents. He was transferred because his use of those terms, both in a public forum and at work, posed the real risk of not only harming CVSD's relationship with its community, but harming CVSD students themselves. Finally, Mr. Thompson was transferred because of his dishonesty during CVSD's investigation.

CVSD did not violate Mr. Thompson's First Amendment rights, and as such, his motion should be denied. Further, even if he could establish the likelihood of prevailing on his First Amendment claim, he is unable to establish that the failure to issue injunctive relief will cause him irreparable harm.

## II. FACTS

In order to determine if the law and facts "clearly favor" Mr. Thompson's position, the Court must engage in the "fact-sensitive, context-specific balancing

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

of competing interests" required by *Pickering*. Those facts are set forth in detail in the accompanying declarations of Jay Rowell, Ann Allen, Mike Syron, Joshua Michel and Rachel Platin (with their respective attachments). Because of page limitations for this brief, those facts are only very briefly summarized herein.

On August 17, 2020, Mr. Thompson posted a rant on his Facebook page that included profanity, derogatory and violent language. ECF 1 ¶ 16; *Screenshot of Randey Thompson Facebook Post.* The post was seen by a fellow CVSD employee and was forwarded to other employees until finally making its way to CVSD Superintendent Ben Small. Rowell Decl. ¶ 2-3.

On August 19, 2020, CVSD placed Mr. Thompson on paid administrative leave while it investigated the matter. *Id.* at ¶ 4. On August 20, 2020, CVSD retained attorney Ann Allen to perform an independent third-party investigation into Mr. Thompson's Facebook post. *Id.* at ¶ 8. Ms. Allen's investigation uncovered a history of concerning behavior by Mr. Thompson that included derogatory and racially insensitive statements to and about students to staff, teachers and students. *Id.* at ¶ 10; Allen Decl. This included referring to Governor Inslee as "Governor Short Bus," frequently using the term "short bus" when discussing special needs students, asking a Black student whether he felt

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 4

he had been treated differently than the "normal" students and referring to students in derogatory terms (i.*e.*, "Tide Pod Challenge Kids" and "Snowflakes"). Allen Decl. ¶ 8.

After receipt of Ms. Allen's interview notes, Associate Superintendent Jay Rowell conducted Impact Interviews with Board members, administrators, teachers and parents to assess whether Mr. Thompson's conduct: (1) had or could have a negative impact on his ability to effectively perform as an administrator; and (2) had or could disrupt or otherwise harm his relationship with other administrators, students, parents, teachers and board members. Rowell Decl. ¶ 11-14; *Impact Interviews.* Overall, the interviewees expressed shock and concern about the statements and reported that the statements were at best insensitive and would definitely be detrimental to an administrator's relationship with staff, students and the community. *Id.* Staff reported they would have a very difficult time working for such an administrator. *Id.* Parents reported they would be wary of sending their children to any school led by an administrator who expressed such things. *Id.*

On September 22, 2020, CVSD held a Notice and Opportunity Meeting with Mr. Thompson to discuss the following two allegations: "(1) you posted an

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 5

inappropriate and offensive comment on Facebook recently; and (2) you have made derogatory and insensitive comments while at work." Rowell Decl. ¶ 16; *Sept. N&O Meeting*. At the meeting, Mr. Thompson claimed that his Facebook account had been "hacked," and that someone had altered his post. Rowell Decl. ¶ 19-21; *Sept. N&O Meeting*. Mr. Thompson acknowledged his understanding as to why CVSD was concerned with his use of the words "Demtard" and "short bus" given his work with special needs students. Rowell Decl. ¶ 24; *Sept. N&O Meeting*. Mr. Thompson did not deny asking a Black student whether he felt that he had been treated differently than "normal" students, but instead said he did not remember that verbiage. He did acknowledge his understanding that the term "normal" in that context is offensive. Rowell Decl. ¶ 26; *Sept. N&O Meeting*.

As a result of Mr. Thompson's claim that his Facebook account had been hacked, CVSD hired a forensic expert (Joshua Michel) to investigate the claim. Rowell Decl. ¶ 30-31. Mr. Thompson was reluctant to participate and withheld pertinent information from Mr. Michel. Michel Decl. ¶ 7, 14, 16, 17; *Forensic Report*. Mr. Michel found no evidence that Mr. Thompson's account had been hacked or his post modified. Michel Decl. ¶ 19; *Forensic Report*.

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 6

On January 20, 2021, CVSD provided Mr. Thompson a Transfer Agreement, giving him the opportunity to voluntarily transfer to a teaching position. Rowell Decl. ¶ 32-33; *Transfer Agreement.* Mr. Thompson rejected the proposed transfer. Rowell Decl. ¶ 34; *Rejection of Transfer Agreement.*

Based on the findings of Mr. Michel and Mr. Thompson's rejection of the proposed transfer, a second Notice and Opportunity Meeting was held on May 6, 2021 to address two new allegations against Mr. Thompson: "(1) you interfered with the District's investigation by deleting emails, by refusing to provide the forensic examiner with your devices, and by wiping and clearing your digital devices; and (2) you have been dishonest by saying that your Facebook account was hacked." Rowell Decl. ¶ 35-36; *May N&O Meeting.* Despite the forensic evidence to the contrary, Mr. Thompson continued to assert that his Facebook account had in fact been hacked. Rowell Decl. ¶ 41; *May N&O Meeting.*

On May 10, 2021, Superintendent Small sent a Notice of Transfer to a Subordinate Position via certified and regular mail to Mr. Thompson. Rowell Decl. ¶ 49; *Notice of Transfer.* The Notice explained that the transfer was in the best interests of CVSD and identified seven (7) specific reasons supporting the same. *Notice of Transfer.* On June 14, 2021, Mr. Thompson attended a regularly

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 7

scheduled Board meeting, whereat Superintendent Small's decision was upheld. Rowell Decl. ¶ 51; *School Board Meeting Minutes.*

### III. LAW/ARGUMENT

Pursuant to Federal Rule of Civil Procedure 65, a district court may grant a TRO in order to prevent "immediate and irreparable injury." Fed. R. Civ. P. 65(b)(1)(A). The analysis for granting a TRO is "substantially identical" to that for a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.,* 240 F.3d 832, 839 n.7 (9th Cir. 2001). It "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008). To obtain this relief, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury in the absence of preliminary relief; (3) that a balancing of the hardships weighs in plaintiff's favor; and (4) that a preliminary injunction will advance the public interest. *Id.* at 20; *M.R. v. Dreyfus,* 697 F.3d 706, 725 (9th Cir. 2012). A plaintiff must satisfy each element for injunctive relief, *Id.,* and a preliminary injunction should only issue if the movant does not have an adequate remedy at law. *Stanley v. Univ. of S. Cal.,* 13 F.3d 1313, 1320 (9th Cir. 1994), *citing Beacon Theatres, Inc. v.*

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 8

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

*Westover*, 359 U.S. 500, 506-07 (1959). The moving party bears the burden of persuasion and must make a clear showing of entitlement of relief. *Winter* at 22.

Mr. Thompson faces a higher standard here because he is seeking to compel CVSD to take specific action - reinstating him as an assistant principal. ECF 7. Mr. Thompson thus seeks a mandatory injunction. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,* 571 F.3d 873, 879 (9th Cir. 2009) (ordering a party to "take action."). A mandatory injunction is particularly disfavored because it "goes well beyond simply maintaining the status quo." *Id.* Thus, mandatory injunctions are not issued in doubtful cases …." *Anderson v. United States,* 612 F.2d 1112, 1115 (9th Cir. 1980) (internal quotation omitted). "When a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party." *Stanley v. Univ. of S. Cal.,* 13 F.3d 1313, 1320 (9th Cir. 1994) (internal quotation omitted). Mr. Thompson cannot meet this high standard for a TRO, especially considering the mandatory nature of the injunction sought.

**A.     Mr. Thompson Will Not Succeed On The Merits Of His Claims.**

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 9

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48, 108 S. Ct. 2250 (1988). Where a public employee claims that his First Amendment rights have been violated, the Court applies a five-step test to balance the government's rights as an employer and the plaintiff's rights as a citizen, pursuant to which the Court must determine:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley,* 552 F.3d 1062, 1070 (9th Cir. 2009).

If the plaintiff passes the first three steps, the burden shifts to the government to show that "under the balancing test established by [*Pickering*], the [state]'s legitimate administrative interests outweigh the employee's First Amendment rights. *Id., citing Thomas v. City of Beaverton,* 379 F.3d 802, 808 (9th Cir. 2004). If the government fails the *Pickering* balancing test, it alternatively bears the burden of demonstrating the fifth element. *Id.*

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 10

### a.     Mr. Thompson Did Not Speak On A Matter Of Public Concern.

Public debate about politics or governmental affairs is generally considered a matter of "public concern." Whether an employee's speech addresses a matter of public concern, however, must be determined by the content, form and context of a given statement, as revealed by the whole record. *Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir. 1993) *quoting Connick v. Myers,* 461 U.S. 138, 47-48 (1983). Not all statements of "public concern" are treated equally under *Pickering. Moser v. Las Vegas Metro. Police Dep't.,* 984 F.3d 900, 905 (9th Cir. 2021). "While courts do not consider the content of speech under the First Amendment, courts – in the limited context of speech by government employees – have effectively established a sliding scale for how much weight to give to a statement of "public concern" when balancing the employee's and government's competing interests." *Id.*

Speech that does not relate to a matter of political, social or other concern to the community will not be considered a matter of public concern. *Warren v. Warrior Golf Capital, LLC,* 126 F. Supp. 3d 988, 994 (E.D. Tenn. 2015) (calling a patron of a golf course the "N-word" was not a matter of public concern); *Cantwell v. Conn.,* 310 U.S. 296, 310 (1940) ("resorts to epithets or personal

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 11

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution"); *Bennett v. Metro Gov't of Nashville & Davidson Cty.,* 977 F.3d 530 (6th 2020) (government did not violate the First Amendment in terminating the employment of an employee who posted a comment on Facebook using the word "Niggaz" because under the *Pickering* analysis, the use of that slur and the effect it had on her coworkers and the community tipped the balance substantially in favor of the employer). Here, Mr. Thompson's use of the word "Demtard" in his Facebook post is analogous to using the "N-word" or an epithet, which has been held to be not a proper communication or information of opinion safeguarded by the Constitution.[1]

In considering content, form and context of Mr. Thompson's speech, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said and how it was said. *Snyder v. Phelps,* 562 U.S. 443 (2011). Mr. Thompson's violent, profane and derogatory language with racial overtones is simply not a matter of "public concern." This is especially true considering Mr. Thompson's testimony that the post was only

---

[1] Relevant in *Bennett* was testimony by fellow employees that the racial slur has a long history of trauma in African Americans. This is akin to Mr. Thompson's use of the words "Demtard" and "short bus" as harmful to special needs students.

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 12

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

intended for "twelve close personal friends." ECF 7-1, ¶ 9. *See*, *Brewster v. Bd. of Educ.,* 149 F.3d 971, 981 (9th Cir. 1998) (finding it "significant" that the teacher's speech "was not directed to the public or the media").

The comments Mr. Thompson made at school, in his role as an administrator, were made to staff members and students Mr. Thompson is supposed to be serving. Referring to Governor Inslee and special needs students using a derogatory and hurtful term ("short bus"), distinguishing Black students from "normal" students and otherwise characterizing students in derogatory terms (i.e., "Tide Pod Challenge Kids") do not fall under the sphere of matters of public concern, especially when said on school grounds to students and staff in a derogatory fashion. Mr. Thompson's First Amendment claim therefore fails.

### b. Mr. Thompson Spoke As A Public Employee.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Here, the speech at issue occurred both outside school and at school. Mr. Thompson argues that his Facebook post was made as a private citizen, as he posted the comment off

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 13

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

school property, on his own private computer during non-school hours, to his account that had no reference to his job at CVSD. This argument ignores the fact that while his Facebook page did not literally list his CVSD employment, his "friends" on his page still recognized him as a CVSD employee, as evidenced by the Facebook comment "CV VP OK?" on the post. Allen Decl. ¶ 3. Further, while Mr. Thompson claims that his post was "private" and distributed only to a group of 12,[2] the truth is that the post was quickly circulated to several CVSD employees who recognized Mr. Thompson as an employee of CVSD. *Id.*

Mr. Thompson's comments at school, during school hours, acting as an assistant principal were undeniably made in his role as a public employee. It is well settled that speech pursuant to an employee's official duties do not insulate the speaker from discipline. "The First Amendment does not protect speech by public employees that is made pursuant to their employment responsibilities—no matter how much a matter of public concern it might be." *Coomes v. Edmonds School Dist. No. 15*, 816 F.3d 1255, 1260 (9th Cir. 2016).

---

[2] Mr. Thompson's claim that he "sent" the post to 12 friends is untrue, as the post was in his feed and viewable to all his Facebook friends. Michel Decl. ¶ 22.

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 14

### c. The Transfer To The Teaching Position Was Not Motivated By Any Protected First Amendment Speech.

While Mr. Thompson's Facebook post triggered CVSD's investigation, his transfer was not the result of exercising his First Amendment rights, as CVSD did not transfer Mr. Thompson based upon his political views. He was transferred because his use of non-protected, derogatory and racially insensitive comments had the potential of harming his relationships with his students, staff and the community, as well as CVSD students themselves. The comments also jeopardized CVSD's own relationship with the community it serves.

Further, Ms. Allen's investigation revealed that teachers and staff had heard Mr. Thompson make harmful statement in the school setting to staff, and even worse, to students. Rowell Decl. ¶ 10. CVSD has an obligation to foster an inclusive learning environment for all students, including minority and special needs students. Since Mr. Thompson's derogatory and racially insensitive statements about and to students were not protected speech, the First Amendment does not preclude CVSD from transferring Mr. Thompson to a teaching position.

While Mr. Thompson's harmful statements about and to students provided CVSD with a legal basis to transfer him to a teaching position, so too did his conduct during CVSD's investigation into the Facebook post. Mr. Thompson

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 15

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

was uncooperative, obstructionist and most importantly, dishonest.[3] Dishonesty towards the school or school board can be adequate grounds for adverse employment action. *See Noel v. Andrus,* 810 F.2d 1388 (5th Cir. 1987).

CVSD did not transfer Mr. Thompson until after it learned of his failure to cooperate, obstructionism and dishonesty. As such, even if Mr. Thompson had some First Amendment right to refer to students in derogatory and offensive terms, and even if he had the First Amendment right to suggest to a Black student that he was not a "normal," Mr. Thompson's First Amendment claim still fails, as CVSD had an independent basis to transfer him to a teaching position.

### d. CVSD Had An Adequate Justification For The Transfer.

"The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public

---

[3] Mr. Thompson claimed a "hacker" altered his post by inserting profanity and violence, as well as altering words so that they were misspelled. Mr. Michel's investigation disproved Mr. Thompson's "hacker" claim. Further, the idea that a "hacker" would alter a post to create misspellings is nonsensical. To any reasonable person is it clear that Mr. Thompson created the censored version of the post after learning that CVSD administration had seen his Facebook post.

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 16

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

services it performs through its employees." *Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968). The "pertinent considerations" are whether the statement (a) impairs discipline by superiors or harmony among co-workers; (b) has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, (c) impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise, or (d) undermines the mission of the employer. *Rankin v. McPherson,* 438 U.S. 378, 388 (1987).

Here, assuming *arguendo* that Mr. Thompson's speech was protected, the harm and disruption caused by that speech justified the transfer. Courts have consistently emphasized "the need for affirming the comprehensive authority . . . of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507, 89 S. Ct. 733 (1969). While school employees do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Id.* at 506, courts have also acknowledged that "[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board, rather than with the federal courts," *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267, 108 S. Ct. 562,

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 17

98 L. Ed. 2d 592 (1988) (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683, 106 S. Ct. 3159, 92 L. Ed. 2d 549 (1986)) (internal citation and quotation marks omitted); *see also Weingarten v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 591 F. Supp. 2d 511, 519-20 (S.D.N.Y. 2008) ("*Weingarten I*") (deferring to expertise of school officials to "understand the needs, capabilities and vulnerabilities of [the student] population").

In applying the *Pickering* balancing test, the Ninth Circuit recognized both the teacher's interest in speaking out on a matter of public concern and the school's considerations of disruption, including intra-school disharmony, the degradation of the teacher-principal relationship, the interference with the teacher's duties and the ultimate falsity of the teacher's allegations. *Brewster,* 149 F.3d at 981. Here, the fact that Mr. Thompson's post was quickly circulated among employees who were concerned enough to forward it Superintendent Small establishes that Mr. Thompson's comments disrupted the harmony among his co-workers. This is important because the relationships between the administrators and teachers, and between administrators and students are "close working relationships with frequent contact and requires trust and respect in order to be successful." *Brewster,* 149 F.3d at 981. In *Brewster*, a single co-

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

worker's testimony that the speech was "hurtful" and led to distrust indicated intra-school disharmony. *Id.* Here, Mr. Rowell's impact interviews establish the clear risk of serious harm and disruption to not only Mr. Thompson's relationship with staff, student and the community, but also to CVSD's relationship with the community it serves. Indeed, the fact that CVSD conducted the impact interviews establishes that the transfer was based upon the statements' impact on others, as opposed to any political views of Mr. Thompson.

Mr. Thompson's conduct had the potential to interfere not only with his supervision of staff but in disciplining students for engaging in similar behavior.[4] Further, as a result of the conduct at issue, Mr. Thompson had already been prohibited from presenting to the staff, even though that was part of his job, based on derogatory terms he had previously used. Syron Decl. ¶ 8-10; Allen Decl. ¶ 9. Mr. Thompson's conduct also undermined CVSD's commitment to a safe and supportive school and work environment for all students, staff, families and community members. *Resolution Recommitting to Equity and Inclusion.*

---

[4] *See, e.g., CVSD Policy 3207* (identifying prohibited harassment, intimidation and bullying to include slurs, demeaning comments and statements motivated by race or disability); *CVSD Policy 3220* (may not cause disruption at school or violate Policy 3207).

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 19

The established disruption caused by Mr. Thompson's conduct, as well as the reasonably anticipated future disruption[5] weighs heavily in favor of CVSD. "In conducting this balancing, courts must give government employers wide discretion and control over the management of [their] personnel and internal affairs. This includes the prerogative to remove employees who's conduct hinders efficient operation and to do so with dispatch." *Gilbrook v. City of Westminster,* 177 F.3d 839, 867 (9th Cir. 1999), *as amended on denial of reh'g* (July 15, 1999). Other cases addressing a school's "strong and recognized interest in maintaining its political neutrality as an educational institution" have found that the school's interest outweigh the teacher's First Amendment interests. *See e.g., Hudson v. Craven,* 403 F.3d 691, 700-01 (9th Cir. 2005).

Mr. Thompson's argument that had CVSD been truly concerned about his conduct it would have terminated him as opposed to transferring him to a teaching position is without merit. Further, it demonstrates not only his misunderstanding of the legal limitations on a school district's ability to terminate a continuing employee versus its ability and right to transfer an

_____

[5] In addition to Mr. Rowell's impact interviews, the reasonably foreseeable disruption from Mr. Thompson's statements is evidenced by the public's response to this lawsuit. *See* Platin Decl.; *Social Media Responses.*

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 20

assistant principal to a teaching position, but also demonstrates a fundamental inability to understand the potential harm his conduct could cause in a leadership/administrative role versus as a teacher. *Id.* Rowell Decl. ¶ 54. Indeed, CVSD's interests in applying the *Pickering* balancing test are much greater because of Mr. Thompson's role as an administrator as opposed to a teacher.

###### e. Application Of Pickering Precludes Mr. Thompson From Establishing That The Law Clearly Favors His Position.

First Amendment law makes clear that because "the underlying determination pursuant to *Pickering* whether a public employee's speech is constitutionally protected turns on a context-intensive, case-by-case balancing analysis, the law regarding such claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity." *Moran v. State of Wash.*, 147 F.3d 839, 847 (9th Cir. 1998) ("today we join the chorus of voices from other circuits that have specifically observed the difficulty of finding clearly established law under *Pickering*,"); *See also*, *Gilbrook,* 177 F.3d at 867 *citing Brewster*, at 980. Although these cases involve qualified immunity,[6] they show the necessity for a

---

[6] Mr. Thompson's claims against the individual defendants will fail through application of qualified immunity. *See*, *e.g., Dodge v. Evergreen Sch. Dist. #114*, 2021 U.S. Dist. LEXIS 83986 (W.D. Wash. 2021). Mr. Thompson's claims against CVSD will fail under *Monell. Id.*

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 21

"fact-sensitive, context-specific" balancing analysis. Here, on the record before the Court, and without any discovery having been performed, Mr. Thompson cannot establish that the law is clearly in his favor. "Finally, because Perez seeks a mandatory injunction, his burden is 'doubly demanding' because he 'must establish that the law and facts *clearly favor* [his] position, not simply that [he] is likely to succeed.'" *Perez v. City of Petaluma*, 2021 U.S. Dist. LEXIS 169405, at 15 (N.D. Cal. 2021), *citing Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). "Perez has not met this 'very high standard.'" *Id*, *citing Gescheidt v. Haaland*, 2021 WL 3291873, at 6 (N.D. Cal. 2021).

**B.      Mr. Thompson Cannot Show Irreparable Harm.**

A district court cannot grant an injunction unless the movant has shown that irreparable harm is likely; the possibility of harm is insufficient to meet the movant's burden. *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011). Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Injunctive relief is not granted where there is an adequate remedy at law, e.g., money damages. *Complete Entm't Res. LLC v. Live Nation Entm't, Inc.*, 2016 U.S. Dist. LEXIS 86418 at 6

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 22

(C.D. Cal. May 11, 2016) ("Loss of money is typically not irreparable harm.");
see also *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2177 (2019)
("Given the availability of post-taking compensation, barring the government
from acting will ordinarily not be appropriate"); *Church of Scientology of Calif.
v. U.S.*, 920 F.2d 1481, 1489 (9th Cir. 1990) ("a mere conclusory allegation of
reputational harm" cannot demonstrate irreparable harm).

The remedies available by Mr. Thompson are limited to money damages.
Should Mr. Thompson prevail in his suit, he would have the opportunity to
recover the damages he alleges. There is nothing about this suit that is urgent
enough to cause the Court to grant preliminary relief to prevent irreparable harm.

**C.    The Balance Of Equities Do Not Tip In Mr. Thompson's Favor, Nor Is An Injunction In The Public Interest.**

"Once an applicant satisfies the first two factors, the traditional stay
inquiry calls for assessing the harm to the opposing party and weighing the
public interest. These factors merge when the government is the opposing party."
*Nken v. Holder*, 556 U.S. 418, 435 (2009). CVSD has a valid interest in
preventing Mr. Thompson from being reinstated as assistant principal during the
course of this litigation. CVSD's job, first and foremost, is to educate and protect
its students. The teachers, parents, school board members and administrative

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 23

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

staff interviewed have established the reasonable likelihood of disruption should Mr. Thompson be returned to an administrative position. This Court need only look at the comments posted on-line about Mr. Thompson's lawsuit to understand the harm to CVSD in reinstating Mr. Thompson to an administrative position. Platin Decl. ¶ 6.[7] A disharmonious school setting would be detrimental to the job of educating students. Mr. Thompson's Facebook post and at-school conduct runs afoul of the mission of CVSD in committing to a safe, positive and engaging learning environment for every student. In addition, the Board can no longer trust Mr. Thompson in an administrative role due to his dishonesty during the investigation. A school board cannot be required to place an administrator they have no trust in, in a position of authority and such high responsibility.

In the unlikely event Mr. Thompson ultimately prevails in this case, his remedy would be money damages, and such would be available for him. Should

---

[7] While the comments vary in their support or condemnation of Mr. Thompson's conduct (only a part of which is known to the posters), the fact that there is a percentage of the public that believes, based upon the limited information known, that Mr. Thompson is a "racist" who "should be fired" or who believe that their children do "not need people like this with poisoned minds and toxic souls in positions of authority" over students, shows the very real risk of harm to CVSD in returning Mr. Thompson to an administrative position.

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 24

Mr. Thompson not prevail, and a preliminary injunction was granted reinstating him as assistant principal, CVSD would have no recourse for the harm caused.

## IV. CONCLUSION

Mr. Thompson's Motion for a Temporary Restraining Order and Preliminary Injunction should be denied. Mr. Thompson cannot establish that the law clearly favors his position, that he may suffer irreparable harm in the absence of an injunction or that there exists an exigency requiring judicial intervention while this matter proceeds.

DATED this 4th day of October, 2021.

EVANS, CRAVEN & LACKIE, P.S.

By: _____ *s/ Michael E. McFarland, Jr.* _____
MICHAEL E. McFARLAND, JR., #23000
Attorneys for Defendants

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
AND/OR PRELIMINARY INJUNCTION - page 25

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Michael B. Love
Michael Love Law, PLLC
905 W. Riverside Ave., Suite 404
Spokane, WA  99201
Email:      mike@michaellovelaw.com

Robert F. Greer
Feltman Ewing, PS
421 W. Riverside Ave., Suite 1600
Spokane, WAm99201
Email:      robg@feltmanewing.com


　　　　　　　   s/    Michael E. McFarland, Jr.　　
MICHAEL E. McFARLAND, #23000
Attorney for Defendants
Evans, Craven & Lackie, P.S.
818 W. Riverside Ave., Suite 250
Spokane, Washington 99201
(509) 455-5200
(509) 455-3632 Facsimile
MMcFarland@ecl-law.com

DEFENDANTS' OPPOSITION TO MOTION FOR TRO AND/OR PRELIMINARY INJUNCTION - page 26